**NORMAN'S ON THE WATERFRONT, Plaintiff**

v.

**WEST INDIES CORP., et al., Defendants**

Civil No. 515-1973

District Court of the Virgin Islands

Div. of St. Thomas and St. John

July 17, 1974

YOUNG, *District Judge*

MEMORANDUM OPINION AND ORDER

These are motions by a number of foreign (alien) supplier-defendants to dismiss the complaint in this action

on grounds of insufficient service of process, improper venue and lack of personal jurisdiction.[1] Memoranda and affidavits in support of the motions were filed by most defendants, and the majority of movants adopted any novel arguments raised by their codefendants. Plaintiff served a number of interrogatories on the defendants which were subsequently limited by the Court to questions deemed particularly relevant to the jurisdictional motions. Most of the defendants have now answered these jurisdictional interrogatories[2] and the facts developed thereby will provide some assistance in disposing of the motions. In addition to these jurisdictional motions, two defendants have challenged plaintiff's complaint arguing that it fails to state a cause of action against the foreign supplier-defendants. After dealing with some preliminary matters, I will proceed to discuss the questions of service of process, venue and personal jurisdiction,[3] leaving my consideration of the cause of action motions for the conclusion of this opinion.

---

[1] Most of the moving defendants raised each of these issues. A few, however, questioned only the Court's jurisdiction over their persons. Because the personal jurisdiction defense is most important and was raised by each of the movants, it will serve no useful purpose to detail precisely which defenses were raised by which defendant. It suffices to note that this opinion will deal with pre-answer motions or requests for preliminary hearings by the following defendants: William Teacher & Sons, Ltd.; James Burrough, Ltd.; John Jameson & Sons, Ltd.; C.D.C. (S.A.); Justerini & Brooks; Ste. Marnier-Lapostolle; Berry Bros. & Rudd; Drambuie Liqueur Co., Ltd.; Peter F. Heering; Noilly Prat & Co.; J & F Martell; Jean Patou (S.A.); Guerlain, S.A. and Guerlain, Inc. Although motions were filed by Chanel, Inc. and Chanel (S.A.) these motions were not argued and plaintiff has stated that the case against them is in the process of being settled. Plaintiff's Memorandum, p. 2, n. 7. Therefore, they will not be decided at this time, but may be heard in the event that settlement negotiations terminate.

[2] No answers were received from defendants Patou and Jameson. William Teacher & Sons, Ltd., responded to the wrong interrogatories, presumably by mistake.

[3] Although I will give some individual consideration to each of these questions, it is my view that the three are quite interrelated. Some issues in the case are relevant both to a resolution of the sufficiency of process and the in personam jurisdiction motions. However, for reasons which will be explained herein, the inquiry into this Court's personal jurisdiction will be most significant and will occupy the greatest part of my attention.

## I. PRELIMINARY MATTERS—VIRGIN ISLANDS LONG–ARM STATUTE

■ Several defendants in their briefs and at oral argument have argued that the complaint is deficient in failing to allege a statutory basis for personal jurisdiction over the foreign suppliers. Paragraph 1 of the complaint states that jurisdiction and venue are founded on 28 U.S.C. §§ 1331, 1337, 1391(b), 1391(d) and 15 U.S.C. § 15. It is true that none of these provisions authorize the exercise of personal jurisdiction. Plaintiff's first memorandum in opposition to the jurisdictional motions suggested that they were relying entirely on the presence of sufficient contacts with the jurisdiction for each defendant so that due process would not be violated by forcing them to defend here. (Norman's Memorandum, 4/19/74 at pp. 4–5.) Of course, such reliance would be misplaced. The due process clause merely places the outer limit on the power of the legislatures to extend the in personam jurisdiction of the courts. Absent some affirmative act of the law making body, there is no authority for the exercise of jurisdiction over non-residents. Certainly the due process clause does not affirmatively confer jurisdiction upon this Court.

■ Plaintiff's subsequent memorandum explains its intention to base personal jurisdiction on the Virgin Islands long-arm statute. Had this statute been referred to in plaintiff's complaint, defendants would have no ground for this objection. The question, then, is whether any consequence should follow from this technical pleading deficiency. In my view, no purpose would be served by requiring plaintiff to amend its complaint, although such an amendment would be permissible with leave of court. Federal Rule of Civil Procedure 15(a); 28 U.S.C. § 1653. It would seem preferable to proceed as if the statutes later

relied upon by plaintiff had been alleged in the original or amended complaints.[4]

The second preliminary question, raised by defendant Peter F. Heering, is whether the Virgin Islands legislature had the power to enact a long-arm statute authorizing service of process beyond this jurisdiction. Because Heering is not a corporation,[5] Section 12 of the Clayton Act is unavailable as a basis for service outside of the jurisdiction, and the long-arm statute is essential if plaintiff is to defend the service attempted. Therefore, I must address myself to this interesting argument which has not heretofore been specifically considered by this Court.

Federal Rules of Civil Procedure 4(e) and (i) provide for service by mail outside the district "whenever a statute or rule of court of the state in which the district court is held" permits extra-territorial service. Heering argues that the Virgin Islands is not a "state" within the meaning of the rules and that this Court is therefore limited to the service specifically authorized by the rules themselves, without reference to any long-arm statute. To support this construction, defendant points to Rule 81(e) which provides that the word "state" includes the District of Columbia, without specifying that the Virgin Islands is similarly embraced by the term. Reference is also made to Rule 54(c) of the Criminal Rules where the term "state" is defined to include the territories.[6] From the failure to

---

[4] In addition to the Virgin Islands long-arm statute which provides the basis for plaintiff's argument that personal jurisdiction over all defendants, 5 V.I.C. § 4903, and service on noncorporate defendants, 5 V.I.C. § 4904, is proper, plaintiff also relies on 15 U.S.C. § 22 as an alternative foundation for venue and for service on corporate defendants. Each of these statutes will be considered by the Court as if they had been alleged in plaintiff's complaint.

[5] The same argument advanced by defendant Heering might well apply to defendants Martell & Co. and Noilly Prat & Co. if their status as partnerships is accepted by plaintiffs or sustained by the Court.

[6] Defendant also relies on similar specificity noted in 28 U.S.C. §§ 1332(d), 1451. Furthermore it points to Rule 81(c)'s discussion of removal from

provide in Rule 81(e) that the Virgin Islands is a "state," defendant would have me hold that it is not.

As a matter of construction, I am not persuaded that defendant is correct. Rule 81(e) does not purport to contain an inclusive definition of the word "state." Indeed, it seems to be addressed solely to the question of the effect of the rules in the District of Columbia. By contrast, Rule 54(c) of the Criminal Rules is a general section entitled "Application of Terms," much more susceptible to an inference that unincluded jurisdictions are intentionally excluded. Furthermore, no legislative history suggesting that Rule 81(e) should be construed as defendant argues has been cited to the Court. Hence, I may presume that there is none.

Several strong arguments are advanced in support of plaintiff's position that the Virgin Islands is a state within Rule 4 and that long-arm service is permissible in this Court. First, the Revised Organic Act § 25 makes the Federal Rules of Civil Procedure applicable to the District Court of the Virgin Islands. The passage of section 25 is the only instance of congressional action specifically addressing the question of the applicability of the Federal Rules to the Virgin Islands. If Congress had intended to limit the availability of long-arm service in the District

"state" courts to United States district courts as an indication that the Virgin Islands is not included within the term "state." Otherwise, it is argued, a rule which applies to this court would be meaningless, since an action cannot be removed from a court to the same court. However, Rule 81(c) is clearly inapplicable and unnecessary in the Virgin Islands and its terminology cannot be used to define sections which do apply and have meaning here. The inapplicability of Rule 81(c) is suggested by the presence of a specific section of the Revised Organic Act (§ 22) governing transfer of actions from the lower courts to this Court and by the fact that this Court is not a "United States" district court, a term of art having historical significance as denoting the constitutional courts created under Article III. Mookini v. United States, 303 U.S. 201, 205 (1938). See, e.g., Government v. Bell, 392 F.2d 207 (3d Cir. 1968); Ferguson v. Kwik-Check Winn-Dixie Stores, Inc., 7 V.I. 639 (D.C.V.I. 1970); Callwood v. Callwood, 127 F.Supp. 179 (D.C.V.I. 1954).

Court of the Virgin Islands it could have done so by rendering the appropriate portions of Rule 4 inapplicable.[7] Because the Virgin Islands legislature could not amend the Rules, the District Court of the Virgin Islands would be so limited until Congress provided otherwise. However, because Congress did not restrict the application of Rule 4, it must be concluded either that no limitation of long-arm service was desired or the problem was not considered. If the problem was not considered, I feel compelled, on the basis of several policy considerations, not to interfere with the operation of the Virgin Islands long-arm statute.

Foremost among these policies is my conviction that the jurisdiction of this Court should be as extensive as that of any district court in the states. Although there is no requirement that states enact long-arm statutes, giving federal courts within their boundaries extended service, the possibility (indeed probability) that states will so act is now an important aspect of a federal district court's jurisdiction. I see no reason why this possibility should be foreclosed merely because a territorial, rather than a state, legislature enacts the extending statute. I feel that the spirit of equality represented by Congress' decision to have the federal rules apply to this Court suggests that those rules should apply to their fullest extent and in the same manner as they would apply in the continental United States. I think this policy consideration was shared by Senior Judge Albert B. Maris and explains his decision in Jensen v. McInerney, 299 F.Supp. 1309 (D.C.V.I.

---

[7] The argument that Congress already limited the process of the Virgin Islands District Court in the first Organic Act, 48 U.S.C. § 1405(2), is unpersuasive. By providing that the process of the District Court "shall run throughout the Virgin Islands," Congress was merely stating that, although there were three major islands and many smaller islands, islets, and cays, service could be made on any one of the islands, islets and cays within two defined jurisdictional divisions, i.e., the "Division of St. Thomas and St. John" and the "Division of St. Croix."

1969), which assumes, without discussion, that the Virgin Islands is a "state" for purposes of Rule 4 and that the long-arm statute is valid.

The second policy in support of plaintiff's position is simply a matter of geography. These are small islands but they attract commerce from around the world. Many United States companies based in continental United States and many companies based in foreign lands have business dealings here. Unfortunately, many of these concerns become involved in disputes, sometimes with local citizens or firms, sometimes with other foreign companies. Because of the diverse locations of potential litigants, it is essential that the process of this court extend beyond its small territory. To conclude otherwise would severely impair the ability of Virgin Islanders and others to enforce their rights and would greatly diminish the effectiveness of this Court as a tribunal for deciding controversies affecting the territory, its citizens and its alien business licensees.

■ Therefore, I conclude that passage of the long-arm statute was within the power of the Virgin Islands legislature and that it authorizes service of process outside of the jurisdiction under Rule 4.

## II. SUFFICIENCY OF SERVICE OF PROCESS

Each of the moving defendants was served by mail. Where long-arm service is authorized, service by mail is permissible.[8] 5 V.I.C. § 4911(a)(3), Rule 4(i)(1)(D).

---

[8] Section 12 of the Clayton Act, 15 U.S.C. § 22, also provides that "process may be served in the district of which [a corporation] is an inhabitant, or wherever it may be found." Although defendants argue that service under Section 12 must be made in some district, I think the better view is that the language "wherever found" contemplates service in foreign countries. Hoffman Motors Corp. v. Alfa Romeo Spa, 244 F.Supp. 70, 79 (S.D.N.Y. 1965). Given this interpretation, service by mail would be authorized by Section 12 through Rules 4(e) and (i)(1)(D).

Therefore, in order to attack the service of process in this case, defendants must argue that the statutory prerequisites for long-arm service were not satisfied.

Long-arm service under the Virgin Islands statute is permitted whenever the exercise of personal jurisdiction is authorized. Thus, if the court has personal jurisdiction over a defendant, the service made here is valid and authorized by the statute. Therefore, the question of sufficiency of process under the Virgin Islands statute will depend on a resolution of the question of personal jurisdiction under that act.

▉ The prerequisite for valid service under Clayton Act § 12 is that venue be proper under the tests set forth in that section. Thus, if a defendant is "found" or "transacts business" within the district, venue is proper and service by mail would be authorized. But the "transacting business" language from this section is identical with one of the principal bases of personal jurisdiction under the Virgin Islands long-arm statute. 5 V.I.C. § 4903(a)(1). Defendants are correct that Section 12's transacting business test for venue purposes is easier to satisfy than the same test for jurisdictional purposes.[9] K. J. Schwartzbaum, Inc. v. Evans, Inc., 44 F.R.D. 589, 590 (S.D.N.Y. 1968); West Virginia v. Morton International, Inc., 264 F.Supp. 689, 691 (D. Minn. 1967). However, this only means that if a defendant has sufficient contacts with the district so that the court has personal jurisdiction over it, venue is certainly proper because its less vigorous transacting business test will necessarily be met. Therefore, the question of sufficiency of process under Clayton Act § 12 can also be

---

[9] This is appropriate because the statutory question of venue is merely one of convenience whereas the issue of personal jurisdiction involves a question of constitutional significance—whether due process is violated by forcing a defendant to litigate in a specified district.

deferred until the issue of personal jurisdiction under the Virgin Islands long-arm statute is resolved.

### III. VENUE

■ If it is determined that a defendant is transacting business in the district for purposes of in personam jurisdiction, it will also satisfy the test of venue set forth in Section 12 of the Clayton Act. Since Section 12 establishes venue only for corporate defendants, plaintiff must look elsewhere in order to sustain the choice of this district for the partnership defendants. Despite the suggestions of several defendants, I conclude that the Clayton Act's venue provisions are not the exclusive guides for venue in antitrust cases, but rather are supplemented by the general venue statutes. Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 291 F.Supp. 252 (E.D. Pa. 1968).

Because all of these movant defendants are aliens, plaintiff relies upon 28 U.S.C. § 1391(d) which provides that "an alien may be sued in any district." Several defendants argue on the basis of old case authority that this language means that venue is proper in any district where the alien can be served with process. Even accepting this gloss on the statute from prior cases, it could be held that an alien could be sued in any district from which long-arm service upon him could be made. Such a construction would remove the substantial limitation which defendants' argument would otherwise impose. However, I do not find it necessary to deal with the question.

■ The Supreme Court has recently ruled in a patent case that Section 1391(d) "is properly regarded, not as a venue restriction at all, but rather as a declaration of the long established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special." Brunette Machine Works, Ltd. v. Kockum

Industries, Inc., 406 U.S. 704, 714 (1972). The broad rationale for the decision leaves no room for argument that it is limited to the patent field. Therefore, because all of these movant defendants are aliens, venue in the district of the Virgin Islands is proper under Section 1391(d). Alternatively, Section 12 of the Clayton Act will support venue here, at least as to those corporate defendants who are subsequently determined to be transacting business in the Virgin Islands.

## IV. PERSONAL JURISDICTION

The question of this Court's jurisdiction over the persons of these defendants is the most difficult decision facing me. As I have stated, if personal jurisdiction is established, then the sufficiency of the service of process follows. It is proper that the issue of personal jurisdiction should occupy such a critical position because it involves a fundamental constitutional question about the extent of this Court's power. The broad guidelines which have been announced by the Supreme Court as to the limitation of the due process clause on the exercise of personal jurisdiction are familiar and can be quickly reviewed.

We learn from International Shoe Co. v. Washington, 326 U.S. 310 (1945), that "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316. The line between those activities which are sufficient to subject a defendant to the Court's jurisdiction and those which are not "cannot be simply mechanical or quantitative." Instead, it will depend upon "the quality and nature of the activity in relation to the fair and orderly administration

of the laws which it was the purpose of the due process clause to insure." 326 U.S. at 319.

In McGee v. International Life Insurance Co., 355 U.S. 220 (1957), the Court noted the trend, clearly discernible from decided cases, "toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents." 355 U.S. at 222. But in Hanson v. Denckla, 357 U.S. 235 (1958), it was said that the evolution toward a more flexible standard of personal jurisdiction over nonresidents does not herald "the eventual demise of all restrictions." 357 U.S. at 251. This is because the restrictions are more than a protection for defendants against inconvenient forums; they are "a consequence of territorial limitations on the power of the respective States." Id. Therefore, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. at 253.

█ It is immediately evident that stating these tests will not resolve a particular case. The exercise merely reminds one that there are some important limits. I think plaintiff correctly argues, however, that the limits are not static. As the Hanson Court recognized, they are influenced by developments in transportation and communication. This is particularly relevant when considering the jurisdiction of a court on a somewhat remote island. To require a European corporation to defend itself in the Virgin Islands might be fair and just today because it is possible for it to communicate with local counsel and travel the distance in a short time, whereas 25 years ago, given the same contacts with the jurisdiction, it would have been so burdensome that a court would conclude that due process would be violated by compelling it to litigate here.

In addition to this factor, I think it is relevant to consider the substantive claims involved in the case when deciding whether personal jurisdiction is present. The broad remedial purpose of the antitrust laws, to which plaintiff refers often, are of some significance when ruling on a jurisdictional motion. It might be fair to force one to defend against serious charges of a large conspiracy to restrain trade, when less pernicious local claims would not warrant drawing a defendant into the jurisdiction.

Finally when ruling on jurisdiction over aliens, the Court must be conscious of the effect of its decision on relations between nations. In some situations notions of comity would militate against action which might appear to be interference with the judicial system of a foreign country. However, foreign corporations which possess sufficient contacts with this jurisdiction cannot assert persuasively that being asked to appear before our judiciary to answer for their conduct here, or the effects of their conduct elsewhere on this jurisdiction, is a disregard of proper respect for the judicial system of foreign nations. Therefore, although I am aware of this argument raised by several defendants, I give it little weight.

■ With these preliminary considerations in mind, I must turn to the statutory basis for exercising personal jurisdiction over these defendants. The Virgin Islands long-arm statute has been held to authorize the exercise of personal jurisdiction to the full extent permissible under the due process clause. Jensen v. McInerney, 299 F.Supp. 1309 (D.C.V.I. 1969). Plaintiff relies upon the following four of its six subsections:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's

(1) transacting any business in this territory;

(2) contracting to supply services or things in this territory;

(3) causing tortious injury by an act or omission in this territory; and

(4) causing tortious injury in this territory by an act or omission outside this territory if he . . . derives substantial revenue from goods used or consumed or services rendered, in this territory. 5 V.I.C. § 4903 (a) (1)–(4).

In deciding if personal jurisdiction is available under these subsections, I must, therefore, give them the most expansive interpretation consistent with the due process clause.

I do not feel that subsection 2 can support in personam jurisdiction over these defendants for several reasons.[10] First the section could be interpreted to require that the contract be entered into within the territory. This would certainly provide a closer contact with the jurisdiction than is the case when the contract is negotiated and completed outside the district. Second, because the sales of these defendants are made FOB some foreign port, it may be that the contract is not to supply things *in* this territory, but rather in a foreign country for eventual shipment here. But my principal concern is that this action does not really arise out of these contracts. There should be a closer nexus between the claim and the contract—as there would be if one contracting party sued another on the contract—than is present here.

Plaintiff's more substantial arguments are based on subsections 1, 3 and 4. The contacts with the jurisdiction upon which plaintiff relies are not the ordinary, obvious indicia of presence within the jurisdiction. Each of the defendants denies being registered to do business here, having offices, phones or other clear signs that they transact business in the district. Plaintiff correctly argues that the absence of these contracts is not determinative because

---

[10] The only contracts involved in this case are those whereby the foreign supplier-defendants agree to sell exclusively to certain local defendants.

neither the due process clause nor the Virgin Islands statute is so demanding. Instead, plaintiff points to visits to the jurisdiction by certain agents or personnel of defendants, the making and enforcement of exclusive distributorship agreements and the substantial shipment of products to the islands as sufficient contacts to support jurisdiction under the statute. Of these factors, it would seem that substantiality of shipments is most important. This is plaintiff's chief basis for arguing that the defendants transact business here within Subsection (1) and "substantial revenue" is a corequisite to the most applicable of the tortious injury sections—§ 4903(a)(4).[11] Therefore, any defendant whose sales in the Virgin Islands are insubstantial would be beyond the in personam jurisdiction of the court, given the absence of other minimum contacts. Before dealing specifically with the sufficiency of the contacts relied upon by plaintiff, it is necessary to review the facts presently before the Court as to each defendant.

*C.D.C. (S.A.)*—C.D.C. has no formal agency agreement with West Indies Corporation, however, West Indies does act as its agent for sales in the Virgin Islands. West Indies' supplemental answer to plaintiff's interrogatory 31 estimates C.D.C.'s 1972 shipments at $39,000; 1971 shipments at $27,000. C.D.C. states that its agents do visit the Virgin Islands "from time to time."

*J & F Martell*—By an agreement dated July 29, 1968, West Indies became the exclusive distributor for Martell. All sales are f.o.b. Bordeaux. Although Martell's interrogatory answers do not reveal sales volume, the affidavit of Michel Martell dated March 19, 1974, estimates that an average of under 1,000 cases are sold per year for less

---

[11] Although plaintiffs refer to § 4903(a)(3), its requirement of an act or omission *in* this territory by the defendant is unlikely to be satisfied. I am unwilling to adopt a tortured construction of the section in order to fit this case within it.

than $40,000. Four goodwill visits were made in the last four years by two company people (J. F. Martell and an overseas representative) to discuss advertising with the distributor.

*Noilly Prat & Co.*—West Indies became the exclusive distributor for Prat by an agreement dated April 4, 1969. All sales are f.o.b. Marseilles. The affidavit of Francois Bonnardel states that around 250 cases are sold each year for barely more than $2,000 per year. The interrogatory answers reveal no visits by agents, employees, etc., to the Virgin Islands.

*Peter F. Heering*—Henry Elliott, Ltd., is the exclusive importer and distributor of Heering products under a written letter and agreement. Answers to interrogatory 45(d) reflect 1973 sales of $271,689; 1972 sales of $238,578 and 1971 sales of $182,376. Mr. Heering visits the Virgin Islands once a year, primarily for vacation purposes, but also discusses business with the distributor. Additionally, Mr. Willy Petersen of San Juan canvasses the Virgin Islands frequently and Heering's export manager visited the island two years ago.

*Wm. Teacher & Sons, Ltd.*—Although Teacher has not responded to the applicable jurisdictional interrogatories, certain facts are revealed by the affidavit of John Hamilton Oliver dated May 3, 1974. General Trading Corporation, a subsidiary of West Indies Corp., is the sole distributor for Teacher and West Indies estimates sales for six months of 1973 at $6,000. The company's senior sales manager visits the Virgin Islands about once a year to maintain contact with the distributor and to promote sales. J. P. Lacarriere, promotional manager, also makes about one visit each year.

*Guerlain, Inc. and Guerlain S.A.*—The relationship between these companies is somewhat complex. Guerlain S.A. has Western Hemisphere Corp., Ltd. (Bahamas), as its

exclusive distributor. Guerlain, Inc., buys perfumes from S.A. and sells directly to retailers, none of whom are in the Virgin Islands. However, Guerlain, Inc., has shipped "minor quantities" to the Virgin Islands directly to customers of Western Hemisphere. No dollar amount or volume of sales was disclosed by either company and West Indies was unable to estimate shipments as they are not a customer. Guerlain S.A. has sent salesgirls to the Virgin Islands on a temporary basis to assist Virgin Islands' customers of Western Hemisphere in selling products. Mr. Jose Assa, sales inspector for Western Hemisphere and also a sales employee of Guerlain, Inc., visits the islands three times each year to meet with customers of Western Hemisphere.

*Drambuie*—Drambuie is distributed in the Virgin Islands by Charles Bellows & Co., Ltd. However it reaches the island after a sale f.o.b. some British port to Albany Co., Ltd. (Nassau), which in turn sells to Consolidated International, Ltd., which then sells to Bellows. Because of these middlemen distributors Drambuie's position is that it makes no direct sales here and therefore supplies no dollar amount or volume of sales. No Drambuie employee or agent has solicited business in the islands for ten years.

*Berry Bros. & Rudd*—Berry's sole distributor in the Virgin Islands is St. Thomas Food Products Corp. (appointed by letter dated May 14, 1970). All sales are f.o.b. United Kingdom. Volume of sales since 1970 has been in excess of 10,000 cases, with a dollar value in excess of $150,000 each year. J. P. Rudd visited the islands with his wife for three days in 1970 to study market conditions and meet socially with people at West Indies (their distributor at that time). Mr. N. Nicolls, export director, made a goodwill visit in 1973, met with S.T.F.P. personnel and observed local market conditions.

*Ste. Marnier-Lapostolle*—Although no document or

513

agreement granting exclusive rights exists, the company's importers here are West Indies and Charles Bellows & Co., Ltd. All sales are f.o.b. Le Havre and have totalled $208,603 in 1973; $233,157 in 1972; $117,465 in 1971 and $116,336 in 1970. A representative of an independent French company visits the islands twice a year on behalf of Ste. Marnier-Lapostolle to inspect customers and distributors.

*Justerini & Brooks*—Henry Elliott, Ltd., acts as exclusive distributor for J & B (most recent agreement dated October 9, 1968). Sales volume has been in excess of $500,000 per year since 1970. J & B's chairman and its area manager have each made two trips to the island since 1967 to observe market conditions, review advertising campaigns and maintain cordial relations with distributors. Additionally a consultant visits the island one or two times each year to observe and report on market conditions.

*James Burrough, Ltd.*—Burrough's sales to the Virgin Islands are estimated by plaintiff, on the basis of case volume, to be about $200,000 each year since 1967.

*John Jameson*—The affidavit of the company's secretary denies the obvious contacts with the jurisdiction, but no further information has been supplied. West Indies estimates yearly sales at about $13,000–$14,000.

*Jean Patou*—Patou indicates, by the affidavit of its president, that all distribution for Patou in the Virgin Islands is done by the Fontana Company, also a defendant in this action. Fontana states that the dollar volume of sales is "confidential information." Three Fontana employees and six of Hemisphere Agencies, Ltd. (Bahamas), have visited the island to contact accounts and take orders. One Fontana employee will now be coming to the Virgin Islands three or four times each year.

 This review of the facts available to the Court

suggests that one defendant—Noilly Prat & Co.—makes negligible sales in the Virgin Islands. No case supports the conclusion that $2,000 per year is substantial revenue or business, regardless of the product and market. Although plaintiff argues that the overlap between Prat and Martell management and the status of one as the subsidiary of the other require that their sales be viewed in the aggregate, I cannot agree. There is no indication that these are not separate companies. Prat, as a separate entity, has no other contacts with the district and therefore will be dismissed for lack of personal jurisdiction.

 It is equally clear that defendants Heering, Berry Bros. & Rudd, Marnier-Lopostolle, Justerini & Brooks and James Burrough are deriving substantial revenue from their sales in the Virgin Islands. Both C.D.C. (S.A.) and Martell, with sales in the $40,000 range, would seem also to meet a common sense substantiality test. Defendants Teacher and Jameson, as best the Court can determine given their failure to supply relevant information in response to plaintiff's interrogatories, have sales in the $12,000–$14,000 range.[12] Defendants Guerlain S.A. & Inc., Drambuie and Patou have not revealed the volume of their sales here and, therefore, no judgment about substantiality can be made as to them.[13]

---

[12] Because the defendants have not supplied information about the dollar value of their sales, I cannot decide their motions at this time. It is obvious from my treatment of defendant Prat that some lines can be drawn to separate defendants making negligible sales from those making substantial ones. But such line drawing is difficult enough, and easily subject to criticism alone, without having to contend with such deficiencies in information.

[13] I do not feel that the layers of agents which these defendants use to distribute their products can conclusively settle the question of their contacts with the jurisdiction. Guerlain, Inc. does not sell to the Virgin Islands but has made minor shipments and has sent an employee (who also works for Western Hemisphere) here. Drambuie and Patou do not reveal the extent to which they control or direct their agents for distribution. Therefore, until these business relationships are further clarified I cannot conclude that the minimum contacts necessary to support in personam jurisdiction are lacking. To conclude that the layers of agents, on their face, insulate the defendants from suit would invite establishment of complicated distributorship arrangements, merely to avoid contacts with the United States

In the case of those defendants who do make substantial sales here, the question facing the Court is whether those sales, together with the visits and exclusive distributorship agreements, constitute "transacting any business" in this territory. An examination of the authorities cited by both sides suggests that this is indeed a close question. Although the contacts shown by the record are probably fewer than in almost every other case where in personam jurisdiction was found, I think that I could hold, consistent with the due process clause, that these defendants transact business here. But in doing so, I would be testing the very outer limit of the due process clause and would be taking an extremely broad and expansive view of personal jurisdiction. It would seem preferable if more information about how the exclusive distributorships arose were available. Also it would be helpful to know more about any meetings here relating to sales and other influences which these defendants might have over their distributors. Although this information might be developed only after further discovery on the merits, it would permit me to assess the "quality and nature" of the contacts, rather than simply noting quantitative aspects. If no other section of the long-arm statute were involved, I might not be willing to require these defendants to remain in the case, solely on the plaintiff's hope that further contacts might be discovered. However, my view of the tortious injury section is such that further discovery will be required in any event. Therefore, it is unnecessary for me to decide if the contacts shown are sufficient to constitute transacting business for those defendants who are deriving substantial revenue from sales here.

 I stated previously that deriving substantial revenue from sales here is one of two requirements set

and its antitrust laws. Moreover, if further answers to interrogatories are forthcoming, it may be that some of these defendants may establish that their sales here are de minimus.

forth in Subsection 4 of our long-arm statute. The question to which I must now turn is whether the test of "tortious injury" can be satisfied in an antitrust case such as this. Does "tortious injury" include the damage to a competitor caused by an antitrust conspiracy? It would seem that the section was addressed more specifically to common law torts and their effects. Probably the injuries alleged here were not a principal, or even a secondary, concern of the legislature in enacting the law. However, I think that the word "tortious," when used in a statute such as this, should have a broader meaning than simply "caused by a common law tort." I do not believe that such a technical construction was intended by the legislature, nor do I feel that it is desirable. Therefore, I hold that "tortious injury" does include injury which becomes the subject of a statutory cause of action, including an antitrust treble damage action.[14]

 The next issue raised in the briefs and at argument is whether an allegation of conspiracy to violate the antitrust law is enough to satisfy the "tortious injury" test and uphold personal jurisdiction over a defendant meeting the substantial revenue test. It has been suggested that some preliminary showing by plaintiff should be necessary before the section can be relied upon. Plaintiff responds that in products liability cases, for example, there is no showing that any particular defendant is liable for tortious conduct. Yet several component manufacturers, some of whom may be entirely blameless, would be required to defend the action and could not argue lack

---

[14] My holding that the tortious injury section of the Virgin Islands long-arm statute does apply to an antitrust action makes the liberal tortious injury personal jurisdiction cases (such as Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.App.2d 432, 176 N.E.2d 761 (1961)), more relevant to the jurisdictional questions raised here. I do not consider these cases to be merely a reflection of the growth of products liability law. Rather, I think the policies upon which they are based are ones of general applicability to cases where tortious injury is caused in a state by the actions of a defendant in another jurisdiction.

517

of tortious injury. There is a distinction between this case and a products liability case. Usually in a products liability case the inference that someone will be liable for injury which has occurred is stronger than in an antitrust case. From the character and circumstances of the injury it is easier to infer that it is "tortious." Statistics might well reveal that the percentage of cases in which liability is established is higher. Here, however, the injury is hard to demonstrate and can be the product of many other factors —inexperienced or unwise business judgment, lack of "business getting" initiative or poor sales operation, to name but a few. Therefore, it is more difficult to infer that a conspiracy exists from the mere fact of an alleged injury to an "also ran" business venture.

For these reasons, I do feel that there is a distinction between products liability cases and antitrust actions insofar as the requirement of tortious injury is concerned. The question is: what should be the consequence of this distinction? Certainly it should not result in dismissal for failure to make a preliminary showing of conspiracy when discovery on the merits has been denied to plaintiff. Therefore, it would seem that discovery must go forward. However, the discovery which will be necessary in order to explore whether a conspiracy existed in order to satisfy the tortious injury requirement is the same discovery which would take place in preparation for a trial on the merits. Therefore, it would be wasteful to go through a "preliminary showing" stage, after further discovery and just prior to trial. Rather, it would be more efficient to proceed to the trial and resolve the question of personal jurisdiction after the evidence, as adduced through discovery, develops. Whenever the Court feels that sufficient evidence exists from which it can be concluded that no conspiracy existed, or that a particular defendant did not take part, the issue of in personam jurisdiction will be

decided. Although the failure to determine the jurisdic-tional question at this early stage imposes additional burdens on the defendants, I predicted that this might be the case in my April 10th Order and, having examined the facts developed thus far, I am convinced that there is no alternative which is fair to plaintiff.

## V. CAUSE OF ACTION

■ The final question for decision is whether the com-plaint states a cause of action against these supplier-defendants.[15] Although it would be possible to indulge in a lengthy discussion of the cases, it suffices to state that I am satisfied that the complaint is sufficient.

Plaintiff alleges that the Virgin Islands defendants have an agreement designed to destroy plaintiff as a com-petitor, to fix prices and to induce suppliers to refrain from selling to plaintiff on the same terms as sales are made to them. ¶ 11. The supplier-defendants are alleged to have aided, abetted and conspired with the local defend-ants by agreeing not to sell to plaintiff and by entering exclusive distribution agreements. Although defendants concentrate on the fact that an exclusive distributorship is not per se unlawful, this does not answer all of plaintiff's allegations nor does it permit me to conclude that no cause of action is stated. While it might appear that the bare allegation of conspiracy has drawn many defendants into this case, plaintiff has alleged all the facts necessary to permit it to proceed to discovery in order to explore the evidence which might support its charges. It is not simply the presence of exclusive importation agreements that is significant. Rather it is the fact that these agreements are made consistently with one group of local businesses,

---

[15] Cause of action motions were made by defendants J & B and Drambuie. J & B argued its motion at the hearing on the personal jurisdiction motions; counsel for Drambuie was unable to attend, but submitted the motion on his extensive brief.

rather than with plaintiff. This circumstance, alone, which was pleaded by plaintiff, makes it legitimate to inquire whether the actions and agreements of these defendants, while perhaps not per se illegal, are unreasonable restraints of trade.

## ORDER

For the reasons stated in the above Memorandum Opinion it is hereby ORDERED that:

(1) Defendant Noilly Prat's motion to dismiss for lack of jurisdiction over its person be GRANTED;

(2) Defendants Justerini & Brooks' and Drambuie's motions to dismiss for failure to state a cause of action be DENIED;

(3) The motions of all defendants to dismiss for improper venue be DENIED;

(4) Rulings on the motions of defendants Teacher and Jameson to dismiss for lack of personal jurisdiction be reserved until such time as plaintiff's interrogatories regarding sales volume are answered;

(5) Rulings on the motions of defendants Guerlain, Inc., Guerlain S.A., Drambuie and Patou be reserved until such time as information on (a) the dollar volume of sales of their products in the Virgin Islands and (b) the relationships between them and their agents is supplied to the Court;

(6) Rulings on the motions of defendants Heering, Berry Bros. & Rudd, Ste. Marnier-Lopostolle, Justerini & Brooks, James Burrough, C.D.C. (S.A.) and Martell be reserved until complete discovery exploring the question whether a conspiracy existed has taken place; and

(7) Limitations on plaintiff's discovery previously imposed by Orders entered on March 25, 1974, and April 10, 1974, be removed so that full discovery on the merits may proceed.